IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| **Ronald Cosner,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:12cv1366 (LMB/TRJ)** |
| | ) | |
| **B. Dodt, et al.,** | ) | |
| **Defendants.** | ) | |

MEMORANDUM OPINION

Ronald Cosner, a Virginia inmate proceeding pro se, has filed a civil rights action,

pursuant to 42 U.S.C. § 1983, alleging that he suffered deliberate indifference to his serious

medical needs while confined at Powhatan Correctional Center ("PCC").[1]  Specifically, plaintiff

contends that defendants delayed providing him appropriate medical care after he ingested a

prison shank, and that as a result the shank could not be extracted by endoscopy.  The matter is

before the Court on Motions for Summary Judgment filed by plaintiff and jointly by defendants.

For the reasons which follow, plaintiff's motion will be denied, defendants' motion will be

granted, and summary judgment will be entered in their favor.

**I. Procedural History**

By Memorandum Opinion and Order dated November 30, 2012, the initial complaint in

this action was dismissed pursuant to 28 U.S.C. § 1915A for failure to state a claim. Dkt. 4-5.  In

an unpublished opinion issued April 30, 2013, the United States Court of Appeals for the Fourth

Circuit vacated the dismissal and remanded the matter for further proceedings.  Cosner v. Dodt,

No. 12-8104 (4th Cir. Apr. 30, 2013); Dkt. 12-13.  Plaintiff was allowed an opportunity to amend

---

[1]Plaintiff is now confined at Greensville Correctional Center.

1

his complaint in accordance with the appellate court's opinion, Dkt. 15, and the ensuing amended complaint became the operative complaint in the action. Dkt. 19.   The defendants remaining in the lawsuit and present movants for summary judgment are Dr. Ronald Toney, medical director at PCC, and B. Dodt, a PCC nurse practitioner.[2]  Plaintiff seeks an award of monetary damages. Am. Compl. at 4.

On January 30, 2014, plaintiff submitted a two-page Motion for Summary Judgment unsupported by evidentiary material, to which defendants responded in opposition on February 28, 2014.  Dkt. 51, 60.  Meanwhile, on February 10, 2014, defendants Dr. Toney and Nurse Dodt also filed a Motion for Summary Judgment with a supporting memorandum and exhibits, and provided plaintiff with the notice required by Local Civil Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975).  Dkt. 53-54.  After receiving an extension of time, plaintiff submitted a Memorandum Opposing Defenses [sic] Motion for Summary Judgment with exhibits.  Dkt. 57, 62.[3]  On March 11, 2014, plaintiff filed a pleading captioned Memorandum Opposing Defendants Response to My Memorandum Opposing Defendants Motion for Summary Judgment.  Dkt. 63.  Defendants moved to strike the pleading on the ground that it was filed without prior leave of court, in violation of Local Civil Rule 7(F)(1).  Dkt. 65-66.  By Order dated April 15, 2014, defendants' motion was denied on the ground that plaintiff is acting pro se, and defendants were allowed ten (10) days within which to respond to plaintiff's memoranda.

---

[2]Plaintiff's claim against named defendant Armor Correctional Health Services, Inc., a corporation allegedly contractually obligated to provide health services to the Virginia Department of Corrections, was dismissed for failure to state a claim pursuant to 28 U.S.C. §1915A(b)(1).  Dkt. 42.

[3]Plaintiff's Memorandum Opposing Defenses [sic] Motion for Summary Judgment has been docketed twice, at Docket ## 57 and 62.  Careful review of both documents as well as the attached exhibits has determined that they are duplicates.

Dkt. 71.   Noting that "the record is replete with documents expressing all parties' positions," the

Order also denied a motion by plaintiff to file an additional brief and to present oral argument.

Id.   Defendants submitted their Memorandum in Response to Plaintiff's Memorandum in

Opposition on April 25, 2014.   Dkt. 72.   Undaunted, plaintiff moved on May 7, 2014 for an

extension of time to file a "reply brief" and to propound interrogatories to defendants' expert, Dr.

Eisner.   Defendants filed their opposition to both requests on May 12,  Dkt. 74-75, and motion

was denied by Order dated May 23, 2014.   This matter accordingly is now ripe for disposition.

After careful consideration, defendants' Motion for Summary Judgment will be granted, and

summary judgment will be entered in their favor.   Plaintiff's Motion for Summary Judgment will

be denied.

## II.  Factual Background

The following material facts are undisputed.   Plaintiff was admitted to the Mental Health

Unit at PCC on June 8, 2012 after undergoing an exploratory small bowel laparotomy and small

bowel resection at Roanoke Memorial Hospital.   Def. Ex. A at 13.   The procedure was

necessitated by plaintiff's ingestion of a foreign body.   Id.    Throughout his confinement at PCC,

plaintiff continued to exhibit self-mutilating behavior.   On July 20, 2012, plaintiff reported that

he swallowed a shank while he was being transported from the Medical College of Virginia

("MCV") to PCC, and also that he had stabbed himself with a metal rod because "I want them to

do surgery to take the other two things I stabbed myself with out."   Id. at 18.   On August 6, 2012,

plaintiff forced a "slender piece of plastic" and a "V-shaped metallic" object "deep" into his

urethra.   Dr. Toney transferred him to MCV for removal of these foreign bodies.   Id. at 31.

When plaintiff returned from MCV the following day, Nurse Dodt noted that the plastic rod had

been extracted from plaintiff's penis.[4]  Id. at 32.  Plaintiff was sent to MCV again on August 11, 2012 for a similar complaint and was discharged the same day.  Id. at 35.

On August 15, 2012, as Dr. Toney was examining plaintiff for complaints of being unable to void, plaintiff reported that he again had inserted two foreign bodies - this time from a safety pen - into his urethra.  Dr. Toney was able to feel the objects in plaintiff's proximal penile urethra.  Def. Ex. A at 37.  On that same day, plaintiff presented to a nurse at PCC with a self-inflicted laceration on his right ankle.  Id. at 38.  Plaintiff was transported to MCV early the next morning, and the foreign objects were removed from his penis. Id. at 42.  On August 20, 2012, plaintiff was readmitted to the mental health unit at PCC and was evaluated for complaints of scrotum pain. Id. at 41-42.  He was treated for scrotum pain three times on August 21, 2012 and twice on August 22, 2012.  Id. at 41, 43.  On August 23, 2012, plaintiff was treated again for scrotum pain, and also was evaluated after he removed stitches from his surgical site.  Id. at 45-46.  On August 24, 2012, Nurse Chandler evaluated plaintiff after he complained of experiencing pain from an erection and requested Ibuprofen.  Later that day, plaintiff was evaluated again after reporting that he had removed another suture from the incision site on his scrotum.  Id. at 46-47.  It is noteworthy for purposes of the instant lawsuit that at no time during plaintiff's daily interactions with medical staff during the week of August 20 through 24, 2012 did he report that he had swallowed a foreign body, nor did he complain of abdominal pain, nausea, blood in his stool or vomiting.  Id. at 41-47.

---

[4]Plaintiff has alleged in a separate § 1983 action that Dr. Toney and other defendants subjected him to cruel and unusual punishment when he was placed on water restriction to check for the presence of blood in his urine after he returned to PCC following removal of the object from his urethra.  Cosner v. Saum, 1:12cv964 (LMB/JFA); see Fed. R. Evid. 201 (a court may take judicial notice of its own records and files, whether it is requested to do so or not); Lolavar v. De Santibanes, 430 F.3d 221, 224 n.2 (4th Cir. 2005).  In that action, summary judgment was entered in favor of defendants on April 21, 2013, and plaintiff took no appeal.

The events that gave rise to this lawsuit began to unfold around midday on Friday, August 24, 2012, when Nurse Dodt was called to the mental health unit in response to an emergency grievance filed by plaintiff stating that he had swallowed a five-inch plexiglass shank on Monday, August 20, 2012. Def. Ex. A at 48; Ex. B at 1. As she approached plaintiff's cell, Nurse Dodt observed that plaintiff was in no apparent distress and was carrying on a conversation with the mental health director and security staff. Def. Ex. A at 48. Nurse Dodt questioned plaintiff about his symptoms. He denied experiencing any "nausea, emesis or [abdominal] pain throughout the week," and he also stated that he had not been short of breath. Id. at 48. Nurse Dodt attempted to perform a physical examination, but plaintiff refused to allow her to take his vital signs or to conduct any assessment of his medical condition. Id. Because of plaintiff's refusal to allow her to attempt to confirm his claim that he had ingested a foreign body, Nurse Dodt determined that plaintiff's vital signs should be taken twice a day and he should be monitored for any sign of a bowel perforation. Id.; Def. Ex. D. ¶¶ 6-8. Nurse Dodt also scheduled plaintiff for an x-ray on Monday, August 27, 2012, and left instructions that a medical provider should be notified of any change in plaintiff's condition. Id.

Plaintiff was examined for a third time on August 24, 2012, this time by Nurse Chandler, after she received a report that he was throwing feces. Def. Ex. A at 47. Plaintiff presented no signs of acute distress. Id.

Plaintiff was evaluated by nursing staff nine times on August 25, 2012 and four times on August 26, 2012. Def. Ex. A at 49-51. On August 25 he refused a nurse's attempt to take his vital signs on one occasion, and refused steristrips for his scrotal surgical site on another. Id. at 49. Again on August 26, plaintiff refused to have his vital signs taken on one occasion and refused to have his surgical area dressed on another. Id. at 50. Over the course of those two days

5

plaintiff made no complaints of nausea or vomiting, and he did not alert medical personnel to any continuing concerns regarding his alleged ingestion of a shank. Id. at 49-51.

Plaintiff was x-rayed on August 27, 2012, and the x-ray showed no evidence of a foreign body in his digestive system. Def. Ex. A at 54. Nurse Dodt noted that there was no palpable mass in the upper left quadrant of plaintiff's abdomen and that he exhibited positive bowel sounds, which indicated that the small bowel had not been perforated. Id.

Dr. Toney re-examined plaintiff the following day, August 28, 2012. The examination revealed no indication that a foreign object was present in plaintiff's abdomen, but Dr. Toney nonetheless ordered a second x-ray. Id. At 10:00 A.M., plaintiff submitted a second emergency grievance, requesting to be sent to the hospital for a CT scan. Def. Ex. B at 2. Nurse Dodt responded to plaintiff at 10:33 A.M. that "[y]ou were seen and examined and a treatment plan was put into place." Id. Later that day, plaintiff filed an Informal Complaint, stating that "[m]edical has chosen an eassier [sic] and less efficaous [sic] form of medical treatment for a 5 inch long plexiglass shank I ingested." Id. at 3.

On August 29, 2012 at 1:35 A.M., the nurse on duty noted both that the toilet contained a large amount of blood after plaintiff defecated, and also that he was complaining of shortness of breath. Def. Ex. A at 52. Pursuant to an order by Dr. Toney, plaintiff was transported to the emergency department of St. Francis Medical Center, id., and subsequently was transferred to MCV. Def. Ex. C at 1. During plaintiff's admission to MCV on August 29, a CT scan was performed which revealed two new foreign bodies in his jejunum, or small intestine, but there was no evidence of a perforation or free air. Id. Staff at MCV noted that the foreign bodies could not be retrieved endoscopically, and plaintiff was admitted to the facility for "monitoring with serial abdominal exams and [kidney, ureter and bladder] imaging to monitor progression

through the small intestine." Id.  As part of plaintiff's admission process a consultation with

MCV's General Surgery department was conducted, and it was determined that plaintiff "did not

require removal of the foreign body as there was no evidence of continued bleed or perforation."

Id. at 7. Plaintiff remained at MCV until September 6, 2012.  Id. at 1.

Upon plaintiff's release from MCV on September 6, 2012, he was readmitted to the

mental health unit at PCC.  An x-ray was performed to ensure that there were no new foreign

objects present in his digestive system.  Def. Ex. A at 58.  From September 6 through September

8, 2012, plaintiff was continuously monitored for any symptoms of perforation.  Id. at 55-59.

According to plaintiff, the knife eventually was surgically recovered from his digestive tract in

March, 2013 at Roanoke Memorial Hospital.  Plf. Mem. at 5.

Defendants have supplied the declaration of Todd D. Eisner, a board certified

gastroenterologist who has "worked eighteen years providing patient care targeted at diagnosing

and treating maladies of the digestive system." Def. Ex. H, ¶ 1. As such, Dr. Eisner is familiar

with the operation of the digestive system with respect to the processing of ingested material and

the symptoms of obstruction and perforation secondary to ingested foreign objects at various

locations within the digestive tract.  Id.  Dr. Eisner explains that once a patient has ingested a

foreign object, three potential treatments exist for its removal: (1) allowing it to pass naturally;

(2) removing it endoscopically; and (3) removing it surgically.  Endoscopic removal is possible

only before the object passes through the pylorus, the region that connects the stomach to the

small intestines.  Id., ¶ 5.  Generally, if an object becomes imbedded or lodged in the stomach it

will remain there until it is endoscopically removed; it is "very unlikely" that the object

subsequently will become dislodged and continue passing through the digestive system.  It is also

"highly unlikely" that a person with a foreign object lodged in his stomach will be asymptomatic;

7

instead, he will manifest symptoms such as stomach pain, nausea, and vomiting within a few

hours after the object is ingested, and the symptoms will continue until the object is removed.  Id.

   In the absence of such symptoms, it is most likely that the foreign object has moved

through the pylorus into the small intestine, a process which generally takes only a few hours

after ingestion.  Once that has occurred, endoscopic retrieval of the object is not possible, thus

leaving only the two treatment options of waiting to see if the object will pass naturally or

removing it surgically.  Id., ¶ 7.  Based upon these considerations and the salient facts outlined

above, Dr. Eisner opined:

> 8.  In this case, the conservative treatment plan ordered by Nurse
> Dodt and Dr. Toney of keeping Plaintiff at PCC for monitoring and
> imaging studies did not impact the subsequent ability of MCV
> medical personnel to retrieve any foreign body he may have ingested
> on August 20, 2012 through endoscopic means.  Specifically, by the
> time Plaintiff had reported his ingestion of the foreign body to the
> medical department, nearly four and a half days had passed.  During
> that intervening period, there is nothing to indicate that Plaintiff
> suffered from symptoms consistent with the foreign body being
> lodged in the pylorus (such as nausea, vomiting, or stomach pain) and
> it appears that he did not make any such complaints to Nurse Dodt
> when she screened him on August 24, 2012.  The absence of these
> symptoms strongly counsel the conclusion that the foreign object
> passed through the pylorus without issue within a few hours of
> Plaintiff ingesting the same and subsequently became lodged in the
> jejunum (the middle portion of the small intestine), where it remained
> and was later detected by CT scan by MCV medical personnel.
>
> 9.  Therefore, endoscopic removal of the object would not have been
> a viable treatment option on August 24, 2012.  Due to plaintiff's
> delay in reporting the ingestion of the foreign body to the medical
> department, the only options available for treating Plaintiff on August
> 24, 2012 would have been waiting to see if Plaintiff passed the
> foreign object or some form of surgical intervention.  It is highly
> unlikely that referral to an offsite emergency department on August
> 24, 2012 would have resulted in the latter, however, as MCV
> personnel declined to perform surgery on Plaintiff after he was
> admitted on August 29, 2012 due to their conclusion that there was

no evidence on [sic] continued bleed or perforation secondary to the two foreign bodies identified in the CT scan.

10.  In short, it is my conclusion to a reasonable degree of medical certainty that sending Plaintiff to an offsite emergency department on August 24, 2012 would not have had any material impact on his subsequent course of treatment.  For this reason, Nurse Dodt's and Dr. Toney's decision on August 24, 2012 to retain Plaintiff at PCC for monitoring and imaging studies instead of directly sending him to an offsite emergency department ultimately is causally unrelated to any continued retention of the foreign object (and any damage or pain caused by the same).  To the extent such developments occurred, they were secured by Plaintiff's own actions - namely his decision to remain silent about ingesting the foreign object for four and a half days.

Def. Ex. H, ¶¶ 8-10.

In plaintiff's Memorandum Opposing Defenses Motion for Summary Judgment, he accuses defendant Dodt of "outright lying" and committing "perjury" in her declaration when she states that he appeared to be in no apparent distress when she was called to the mental health unit on August 24, 2012.  Dkt. 62 at 1.  In support of this contention plaintiff points to the emergency grievance dated August 24 at 12:25 p.m. on which he wrote: "Monday afternoon, I ingested a 5" long plexiglass shank as sharp as a needle, and it was double-edged as well. (Occurred Monday around 2 pm).  'My stomach is in pain.'"  Id., Ex. B-1.  At 12:54 p.m. that same day Nurse Dodt responded, "RN attempted vital signs and assessment, patient refused.  Will continue to monitor and attempt assessment."  Id.  According to plaintiff, he was "having and complaining of severe stabbing abdominal pain behind [his] left rib cage" which in his view "would indicate to anyone who is familiar with human anatomy that the knife was present in [his] stomach," but Dodt nonetheless failed to send him for an immediate endoscopy to remove the shank and stated to him, "Your [sic] not going to the hospital like you want to."  Id. at 2.  Plaintiff explains that this "grossly and maliciously inadequate care" made him "upsetted" and "angry" so he refused Dodt's

9

attempt to take his vital signs. Id.   Plaintiff further asserts that "any reasonable person ... would have sent [him] to the emergency room ASAP, as the pain indicated the presence of the knife inside the stomach, and therefore [was] removable with endoscopy," but nonetheless he had to wait three (3) days to receive an x-ray. Id.  Plaintiff alleges that during that period the "pain did not shift" from what he characterizes as his stomach until shortly after he was x-rayed on August 28, and he asserts that physicians at MCV "informed" him that "the location and pain type probably indicated the knife was located in the stomach until the shift of pain and therefore had the defendants sent me out a few hours prior to the shift in pain, the object could and would have been removed endoscopically." Id. at 3.  This in turn allegedly "would have saved [plaintiff] several months of pain, suffering and agony which the defendants intended to cause for punishment." Id.  Plaintiff makes similar statements regarding Dr. Toney's "lies" and alleged failure to react appropriately to plaintiff's complaints of "stabbing pain." Id. at 6-8.  Plaintiff further urges the court to disregard Dr. Eisner's declaration because his opinion is predicated on defendants' factual recitations which do not include any description of plaintiff's abdominal pain, and "had he know [sic] the intensity and location of my pain he would have reached a different opinion entirely." Id. at 7.

### III. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that summary judgment is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To meet that burden, the moving party must demonstrate that no genuine issues of material fact are present for

resolution. Id. at 322.  Once the moving party has met its burden to show that it is entitled to

judgment as a matter of law, the burden shifts to the non-moving party to point out the specific

facts which create disputed factual issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Those facts which the moving party bears the burden of proving are facts which are material.

"Only disputes over facts which might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  An issue of

material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative

assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.

1985).  Thus, summary judgment is appropriate only where no material facts are genuinely

disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-

moving party. Matsushita, 475 U.S. at 587.

## IV.  Applicable Law

To state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff

must allege facts sufficient to show that jail officials were deliberately indifferent to a serious

medical need. Estelle v. Gamble, 429 U.S. 97, 105 (1976); Staples v. Va. Dep't of Corr., 904

F.Supp. 487, 492 (E.D.Va. 1995).  To establish that inadequate medical treatment rises to the

level of a constitutional violation, a plaintiff "must allege acts or omissions sufficiently harmful

to evidence deliberate indifference to serious medical needs." Id. at 105.  Thus, to prevail on a

claim of deliberate indifference to a serious medical need, a plaintiff must demonstrate both the

objective and the subjective component of the cause of action. Hudson v. McMillian, 503 U.S.

1, 20 (1992).  The objective component consists of showing that plaintiff suffered from a

sufficiently serious medical need.  A serious medical need in this context has been defined as

"one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Bane v. Va. Dep't of Corr., 2012 WL 6738274 at *6 (W.D. Va. Dec. 28, 2012) (citations omitted); see, e.g., Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is serious); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is serious).

The subjective component necessary to establish deliberate indifference requires a demonstration that prison medical personnel acted with a sufficiently culpable state of mind. That is, the plaintiff must prove that a particular defendant actually knew of and disregarded a substantial risk of serious harm to plaintiff's health. Farmer v. Brennan, 511 U.S. 825, 835 (1994). To do so plaintiff must demonstrate both that facts existed from which the medical provider could infer the existence of a substantial risk of harm to plaintiff, and that the provider actually drew that inference. Id. at 837. Further, the plaintiff then must show that after drawing the inference, the provider disregarded the risk by failing to take "reasonable measures" to alleviate it, id. at 832, "by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Unpublished authority in this circuit holds that proving the subjective element of deliberate indifference requires a showing "at a minium, that the defendant thought about the matter and chose to ignore it." Harden v. Green, 27 Fed. App'x 173, 178 (4th Cir. 2001); Clinkscales v. Pamlico Corr. Facility Med. Dep't, 2000 WL 1726592 at *2 (4th Cir. Nov. 21, 2000). Courts have emphasized that the subjective component of a deliberate indifference claim is not satisfied by a showing of medical malpractice, since the wantonness necessary to establish a constitutional violation goes well beyond negligence or a failure to act reasonably. Patten v. Nichols, 274 F.3d 829, 834 (4th Cir. 2001). Nor can an "attempt to second-guess the

propriety or adequacy of a particular course of treatment" received by an inmate establish
deliberate indifference, Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir 1977); instead, "[p]rison
officials evince deliberate indifference to a serious medical need by completely failing to
consider an inmate's complaints or by acting intentionally to delay or deny the prisoner access to
adequate medical care." Hicks v. James, 255 Fed. App'x 744, 749 (4th Cir. 2007). In other
words, the failure to provide treatment must have been"[s]o grossly incompetent, inadequate, or
excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896
F.2d at 851 (citations omitted).

A delay in medical treatment may constitute deliberate indifference. See Smith v. Smith,
589 F.3d 736, 739 (4th Cir. 2009) (citing Estelle, 429 U.S. at 104-05). In such cases, in addition
to establishing that his medical need was objectively serious, a plaintiff also must show that the
delay in providing medical care caused him to suffer "substantial harm." See Webb v.
Hamidullah, 281 Fed. App'x. 159, 166 (4th Cir. 2008); Shabazz v. Prison Health Servs., No.
3:10cv190, 2011 WL 2489661, at *6 (E.D. Va. Aug. 9, 2011). "The substantial harm
requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain."
Shabazz, 2011 WL 2489661, at *6; see also, Coppage v. Mann, 906 F.Supp. 1025, 1037 (E.D.
Va. 1995).

## V. Analysis[5]

---

[5] In their Motion for Summary Judgment and supporting memorandum, defendants
argued in reliance on a grievance record received from the grievance custodian at PCC that
plaintiff had failed to exhaust his administrative remedies prior to filing this lawsuit, as required
by 42 U.S.C. § 1997C. Dkt. 53 at 20-21. However, plaintiff attached a copy of a document that
had not been supplied by the custodian as an exhibit to his Memorandum in Opposition to
Defendants' Motion for Summary Judgment. Dkt. 57, Ex. 1. In their subsequent response to
plaintiff's memorandum, defendants acknowledged that their prior argument was made in error,
withdrew it, and conceded that plaintiff had exhausted his administrative remedies. Dkt. 60 at 7.

When the foregoing principles are applied to the undisputed facts at bar, defendants are entitled to the summary judgment they seek. Distilled to its essence, plaintiff's claim amounts to the contention that he should have been immediately transported to an outside medical facility and provided with an endoscopy to remove the knife from his stomach when he reported its ingestion on August 24, 2012, and in his view the fact that no such treatment was forthcoming violated the Eighth Amendment. Am. Compl. ¶¶ A, C, E. As discussed below, plaintiff has failed to establish either of the requisite elements for a successful claim of deliberate indifference.

A. Objective Component

For purposes of this analysis, the Court assumes, as did the defendants, that plaintiff's ingestion of a prison shank created a serious medical condition.[6] Because plaintiff alleges that the delay in providing outside treatment for that condition is what constituted an Eighth Amendment violation, he would have to show that he suffered "substantial harm" as the result of that delay. Shabazz, 2011 WL 2489661, at *6. The uncontroverted evidence establishes the contrary. Information provided by plaintiff in his own emergency grievance and also by defendants in their declarations demonstrates that plaintiff swallowed the knife on August 20, 2012, but did not report his action to prison officials until August 24, 2012. Ex. A at 48.

------------------------

[6]The Court also assumes for purposes of this discussion that the plaintiff swallowed a shank on August 20 and that that shank was the cause of his subsequent medical course; however, as discussed above, the record evidence shows that plaintiff ingested a number of other foreign objects around the same time period, and were this case to go forward evidentiary consideration of whether it actually was that shank and that shank alone that caused his injury would be required. The fact that plaintiff reported upon his admission to MCV on August 29 that he had swallowed the foreign body "some weeks earlier," Def. Ex. C at 3, casts serious doubt on that assumption.

Gastroenterologist Dr. Eisner and both defendants attest to the fact that endoscopy, plaintiff's desired course of treatment, cannot effectively be employed to remove a foreign object ingested that long before treatment commences. Defendants acknowledge that had plaintiff alerted them to his action earlier, transferring him to MCV for endoscopic removal of the shank might have been their recommended course of treatment, Def. Ex. D ¶ 7; Ex. E. ¶ 7, but since over four days had passed before they were made aware of the presence of the shank in plaintiff's system that procedure was no longer a feasible option. In fact, when plaintiff was transferred to MCV on August 29, 2012, physicians there noted both that the shank was "not accessible by endoscopy," Def. Ex. C at 1, and that plaintiff was not a candidate for surgical intervention "because there was no evidence of continued bleed or perforation." Id. at 7. Thus, MCV medical staff took the same action as did the defendants, that is, they declined to remove the shank from plaintiff's digestive system. Id. at 1, 7.

This lack of immediate treatment at MCV is compelling evidence that plaintiff suffered no "substantial harm" as a result of defendants' alleged delay in sending him for outside treatment. As described above, when defendants learned on August 24 that plaintiff reported swallowing a knife four and a half days earlier they decided to monitor his condition to see if the object would pass through his system or cause a perforation and require surgery, because by then the time was long past when it could have been successfully removed endoscopically. Ex, H ¶¶ 8-9. Had plaintiff been sent immediately to MCV on August 24, as he argues should have happened, it is clear he would have received no different treatment, because when he was transported to MCV on August 29 the doctors there opted for the same "wait and see" approach to his condition rather than endoscopic or surgical intervention. In short, the evidence indicates that the only delay which might have caused plaintiff substantial harm was his own four-day

delay in reporting his ingestion of the knife to prison officials, since that is what foreclosed the possibility of endoscopic removal of the object. Defendants' alleged "delay" in transferring plaintiff for outside medical care once they received that news made no difference in plaintiff's subsequent medical course, because once he arrived at MCV he continued to receive the same conservative care that defendants had been providing. Thus, plaintiff has failed to show that he suffered substantial harm as the result of defendants' challenged conduct, and the objective component of his deliberate indifference claim is not met.

      B. Subjective Component

      Moreover, even had plaintiff successfully demonstrated a genuine issue of material fact as to whether he suffered substantial harm as the result of defendants' actions, he has fallen well short of establishing that either Dr. Toney or Nurse Dodt was deliberately indifferent to his medical needs. Instead, the uncontroverted evidence demonstrates that both defendants took reasonable measures to respond to the medical risks plaintiff faced based upon the contemporaneous information available to them.

      Specifically as to August 24, 2012, when plaintiff submitted the emergency grievance revealing his ingestion of the knife on August 20,[7] Dr. Toney and Nurse Dodt were not presented with facts that reasonably would have led them to infer that plaintiff faced a risk of substantial harm. Def. Ex. D ¶ 7; Ex. E ¶ 7. Plaintiff had been examined multiple times by medical staff for other complaints during that period, Def. Ex. A at 41-47, and at no point did he report experiencing abdominal pain, nausea, vomiting, bloody stools, or any other signs consistent with

---

[7]Specifically, plaintiff stated in the emergency grievance: "Monday afternoon, I ingested a 5" long Plexiglass shank as sharp as a needle, and it was double-edged as well. (Occurred Monday around 2 pm.) 'My stomach is in pain.'" The grievance is dated "8/24/12 / 12:25 p.m." Def. Ex. B at 1.

abdominal or bowel perforation. Id.  Moreover, when Nurse Dodt responded to the grievance on August 24 by going to examine plaintiff, he denied experiencing emesis (i.e., vomiting), shortness of breath, nausea or abdominal pain, and he refused to allow Nurse Dodt to check his vital signs or otherwise to examine him. Id. at 48.  Thus, plaintiff did not present on August 24 with any signs or symptoms that he was in distress or at a substantial risk of immediate harm. Def. Ex. D ¶ 7; Ex. E ¶ 7.

Moreover, even if plaintiff's report of having ingested the shank were deemed to have been sufficient, standing alone, to alert medical staff that a substantial risk of harm existed, the evidence belies any inference that either defendant drew that inference and then disregarded the risk.  To the contrary, Dr. Toney and Nurse Dodt immediately implemented a treatment plan that included monitoring plaintiff's vital signs twice daily, monitoring plaintiff continuously in the mental health unit for signs or symptoms of perforation, instructing medical staff immediately to communicate any change in plaintiff's condition, and ordering x-rays. Def. Ex. A at 4; Ex. D ¶¶ 7-8; Ex. E ¶ 7. It is readily apparent from the defendants' reaction to plaintiff's revelation both that they recognized the existence of risk to plaintiff and that they did not ignore it. Cf. Harden, 27 Fed. App'x at 178.  Further, for the reasons more fully developed in the foregoing discussion of the objective element of plaintiff's claim, the treatment plan initiated by defendants constituted "reasonable measures" to alleviate plaintiff's risk, given that he had ingested the shank over four days before he brought his action to defendants' attention. Cf. Farmer, 511 U.S. at 832.

C.  Plaintiff Creates No Genuine Issue of Fact

In his Memorandum Opposing Defenses Motion for Summary Judgment (hereinafter "Plf. Mem."), Dkt. 57, plaintiff attempts to rebut defendants' position by arguing under penalty

of perjury that: (1)  he made complaints of stomach pain to defendants that were not documented in his medical record, id. at ¶¶ 1.B, 1.D, 1.F, 2.A, 2.B, 2.D, 4.A, 5; (2) he was experiencing pain "behind [his] left rib cage" on August 24, which indicated that the shank was still present in his stomach at that time, id. at ¶ 1.D; and (3) the pain shifted on August 28, and his treating physicians at MCV told him that the shift meant that the object had passed into his small intestine, id. at ¶¶ 1.E, 1.I, 2.D.  These statements fail to create a genuine issue of material fact for at least three reasons.

First, plaintiff relies only on his own allegations in making these arguments; he fails to present any objective evidence to support his contentions.  As a general rule, the non-moving party may not defeat a properly-supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).  Even where the non-moving party in such a situation is a pro se prisoner entitled to liberal construction of his pleadings, a "declaration under oath ... is not enough to defeat a motion for summary judgment.  He has to provide a basis for his statement.  To hold otherwise would render motions for summary judgment a nullity." Campbell-El v. Dist. of Columbia, 874 F.Supp. 403, 406 - 07 (D.C. 1994); see also, Hines v. Correct Care Solutions, LLC, 2013 WL 791231, at *2 (E.D.N.C. Mar. 4, 2013) (where defendants presented medical records and an expert's affidavit to support their motion for summary judgment on a claim of deliberate indifference, plaintiff's reliance only on his own testimony that he had made more health care requests than the record reflected did not create a genuine issue of material fact as to whether defendants disregarded a substantial risk of injury). Here, plaintiff's unsupported assertions are insufficient to carry his burden to point out specific facts which create disputed issues with those demonstrated by the defendants. Liberty Lobby, 477

U.S. at 248.

Second, to the extent that plaintiff attempts to rely on the purported statements of unidentified medical personnel at MCV to support his theory that pain behind his rib cage indicated that the knife remained in his stomach until August 24 and that a shift in the pain's location meant that it entered his small intestine on August 28, his argument fails. No such opinions were memorialized in plaintiff's MCV discharge summaries, Def. Ex. C, and no other objective evidence supports their existence. Moreover, assuming that the alleged oral statements on which plaintiff seeks to rely were made but not memorialized, they are hearsay and cannot be used to support his position. Fed. R. Civ. P. 56 (c)(2); see Whittaker v. Morgan State Univ., 524 Fed. App'x 58, 60 (4th Cir. 2013) ("While a party may support its position on summary judgment by citing to almost any material in the record, the party's reliance on that material may be defeated if 'the material cited to support or disprove a fact cannot be presented in a form that would be admissible in evidence.'")

Third, plaintiff has failed to produce any objective evidence whatever to contradict the facts expressed by Dr. Eisner. According to Dr. Eisner, if the shank had lodged in plaintiff's stomach, plaintiff would have begun to manifest symptoms such as stomach pain, nausea and vomiting within a few hours of ingestion, and the symptoms would have continued until the shank was removed. Def. Ex. H ¶ 6. On August 20, 2012 - the date plaintiff states he ingested the shank - he had no such symptoms, and none were observed on August 24, 2012. Def. Ex. A at 41-42. Therefore, pursuant to Dr. Eisner, the shank must have passed through plaintiff's pylorus and entered his small intestine that same day. Accordingly, as of that day plaintiff was no longer a candidate for endoscopic removal of the shank, and any alleged delay thereafter in sending him to an outside hospital did not affect his course of treatment or prolong his pain.

Lastly, plaintiff's theory that the alleged shift in his pain from his "stomach" to his lower abdomen corresponded to the location of the knife within his system over a week after he admittedly ingested it is directly contradicted by the facts established by Dr. Eisner.  Because plaintiff's position is unsupported by any evidence, it does not create a genuine issue of material fact, and does not preclude the entry of summary judgment for defendants.

As noted above, plaintiff subsequently filed a second memorandum opposing defendants' summary judgment motion, which was permitted in deference to his pro se status. In it, plaintiff essentially reasserts much of what he argued in his first memorandum.  He places greater emphasis on the contention that Nurse Dodt failed to document his complaints of pain and lied about them in her declaration.  Plf. Mem., Dkt. 63 at ¶ II.A.[8]  As discussed above, however, Nurse Dodt responded to plaintiff's emergency grievance regarding his ingestion of the knife by going to his cell to evaluate him, and her note dated 12:56, August 24, 2102 reflects her findings both that plaintiff expressed no complaints to her and that she did not observe any indications that he was in distress.  Def. Ex A at 48.  Further, plaintiff's authenticated medical records establish that he made no complaints of nausea, emesis or abdominal pain throughout the week after he  ingested  the shank.  Id. at 41-48.  And, in contrast to plaintiff's allegation that Nurse Dodt purposefully omitted his complaints of pain from the medical record,  numerous instances are documented of plaintiff complaining of scrotum pain associated with the foreign objects he forced into his urethra on August 6 and August 15.  Id. Plaintiff also charges in his second memorandum that defendants were motivated in their failure to treat him properly by a desire to

---

[8]Plaintiff's Memorandum Opposing Defendants' Response to My Memorandum Opposing Defendants Motion for Summary Judgment was filed along with a motion for appointment of counsel.  Both pleadings were docketed together as a Motion for Appointment of Counsel at Docket # 63.

deter him from committing further acts of self-harm.  These self-serving allegations are unsupported by any evidence and are at least inferentially contradicted by the authenticated medical record.  Therefore, they fail to establish a genuine issue for trial.

## VI. Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment will be granted, and  plaintiff's Motion for Summary Judgment will be denied. An appropriate Order and Judgment shall issue.

Entered this _____ day of _____ 2014.

Alexandria, Virginia

_____
/s/

Leonie M. Brinkema
United States District Judge